**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LISA BRAUNINGER,                                      Case No. 1:16-cv-926

               Plaintiff,                              Black, J.
                                           Bowman, M.J.

    v.


COMMISSIONER OF SOCIAL SECURITY,

               Defendant.


## REPORT AND RECOMMENDATION

Plaintiff Lisa Brauninger filed this Social Security appeal in order to challenge, for the second time in this Court, the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Plaintiff presents two closely related claims of error for review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

### I. Summary of Administrative Record

In August 2011, Plaintiff filed concurrent applications for supplemental security income ("SSI") and for Disability Insurance Benefits ("DIB"), alleging disability based on severe low back pain and depression, with a disability onset date of September 30, 2008. After her applications were denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an administrative law judge ("ALJ"). On January 8, 2013, ALJ John Pope conducted a hearing by videoconference at which Plaintiff appeared, together with the same attorney who continues to represent her in this Court. (Tr. 39-132). Following the hearing, the ALJ issued a written decision in which he concluded that, despite her severe impairments of lumbar degenerative disc

1

disease and major depressive disorder, Plaintiff could continue to perform the demands of a limited range of light work. (Tr. 16-32). Plaintiff filed a judicial appeal in this Court.

In response to Plaintiff's Statement of Errors, the Commissioner moved to remand the case for further proceedings, conceding that ALJ Pope's decision contained inconsistencies and failed to adequately explain why Plaintiff's spine impairment did not meet or medically equal Listing 1.04, entitling her to benefits. (*See* Case No. 1:13-cv-388). Defendant requested that the matter "be remanded…with instructions to conduct a new hearing, re-evaluate the evidence regarding plaintiff's musculoskeletal impairment, and consider evidence of plaintiff's possible prescription drug abuse and non-compliance with prescribed treatment." (Tr. 1046-1047). Plaintiff vigorously opposed remand, arguing that the Court should instead make an outright award of benefits. However, this Court agreed with the Commissioner that remand for further fact-finding was required,[1] because "even if plaintiff were found to be disabled based on the instant record, the Commissioner would still have to consider the effect of plaintiff's drug abuse and non-compliance with prescribed treatment" to determine whether the drug abuse was a "contributing factor material to [the] disability finding," and/or whether following prescribed treatment could restore Plaintiff's ability to work. (Tr. 1047-1048).

On remand, the case was re-assigned to a new ALJ. ALJ Motta held an evidentiary hearing on January 12, 2015 (Tr. 870-930), and conducted a supplemental hearing on July 8, 2015. (Tr. 831-868). Plaintiff appeared at both hearings, and testified at the first.

---

[1]Plaintiff's prior case was assigned to U.S. Magistrate Judge Litkovitz for a Report and Recommendation, which was subsequently adopted by U.S. District Judge Beckwith.

Plaintiff testified that she suffered an initial back injury as a result of a work-related automobile accident in 2002, for which she received workers' compensation benefits.  She continued to work until September 2008, when she alleges her disability began.  Plaintiff has a Bachelor's degree but her employment history reflects only a "long series of very short-term jobs….going back to 2000," with no longer term work. (Tr. 880).  When questioned about that relatively weak employment history, Plaintiff explained that she juggled short-term unskilled jobs for personal reasons, due to the illness and eventual death of a fiancé in 2002, followed by the illness of her mother. After her fiancé's death, Plaintiff became her mother's main caregiver, until her mother's death in August 2010.  (Tr. 880-881).  Over time, she took care of virtually all of her mother's physical needs, including bathing, as her mother lived in a duplex and did not have a nurse's aide to assist with those needs other than "once in a while."  (Tr. 908).

Two different Medical Experts testified at the January and July hearings, while Vocational Expert Eric Pruitt provided testimony at both hearings.  On September 22, 2015, ALJ Motta issued a written decision, again denying Plaintiff's claims. (Tr. 795-821).  The Appeals Council denied Plaintiff's request for review, leaving the September 2015 decision as the final decision of the Commissioner.

Plaintiff's DIB insured status expired on March 31, 2014, when Plaintiff was 47 years old; she was 48 at the time of the ALJ's last decision. (Tr. 799).  Her employment history includes no past relevant work or transferable work skills. (Tr. 819).  Plaintiff testified that she had "[n]ot yet" completed any graduate work but was "considering" going to law school.  (Tr. 877).

ALJ Motta added to the list of severe impairments found by ALJ Pope, finding that Plaintiff has "lumbar spine degenerative disc disease, mild obesity, cervical spine

degenerative disc disease, major depression, [and a] history of substance abuse." (Tr. 800). However, she determined that Plaintiff's impairments did not meet or medically equal any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically rejecting Plaintiff's contention that she meets or equals Listing 1.04. (Tr. 808-811). Rather than the "light" RFC found by ALJ Pope, ALJ Motta found that Plaintiff retained the residual functional capacity ("RFC") to perform work at a sedentary level, with the following restrictions:

> lifting no more than ten pounds occasionally and less than ten pounds frequently; standing and walking no more than a combined total of two hours during an eight-hour workday; sitting up to six hours during an eight –hour workday; the opportunity to alternate between sitting and standing as much as five minutes per hour (while remaining "on task"); no climbing ladders, ropes, scaffolds; no exposure to hazards such as dangerous machinery or unprotected heights; no exposure to vibration; no walking on uneven terrain; postural activities (i.e., climbing ramps or stairs, balancing stooping, crouching, kneeling, crawling, twisting side to side) can be done no more than occasionally; reaching with the upper extremities (in all directions) can be done no more than frequently; only occasional use of left foot controls; only simple repetitive tasks of a low-stress nature (i.e., no production quotas or fast-pace and only routine work with few changes in the work setting); no contact with the public; no more than occasional contact with co-workers and supervisors.

(Tr. 811). Based upon these limitations and testimony from the Vocational Expert, the ALJ found Plaintiff could perform more than 300,000 unskilled jobs that exist in the national economy, including the representative occupations of laminator, gauger, and film touch-up inspector. (Tr. 820). Therefore, the ALJ concluded that Plaintiff is not under a disability. The Appeals Council denied review, leading Plaintiff to file this second judicial appeal.

In a 32-page Statement of Errors, Plaintiff argues that the ALJ erred by: (1) failing to find that she met or equaled Listing 1.04A, and (2) improperly weighing the medical opinion evidence concerning her back impairment.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits

5

analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Specific Errors**

**1. Step 3 Error: Listing 1.04A**

Plaintiff first argues that, notwithstanding her greatly expanded analysis,[2] ALJ Motta repeated the errors of ALJ Pope by failing to conclude that Plaintiff's back condition meets or equals Listing 1.04A. I find no error.

---

[2]ALJ Pope explained his reasons for concluding that Plaintiff did not meet or equal Listing 1.04 over the course of three paragraphs. (Tr. 24-25). By contrast, ALJ Motta's Step 3 analysis was expanded to encompass six pages, with approximately 20 paragraphs devoted to discussion of Listing 1.04. ALJ Motta acknowledged that the "primary basis for the Court's remand of the prior decision" was to provide additional Step 3 analysis, (Tr. 806), and that the "crux of this case is whether the claimant's spinal impairment is of Listing-level severity…." (Tr. 808).

Plaintiff bears the burden of proof to demonstrate that she meets every component of a Listing. *See Her v. Com'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). Listing 1.04 applies to disorders of the spine that compromise the nerve root or spinal cord. Plaintiff has been diagnosed with both lumbar and cervical spine degenerative disc disease, with compromise of the "L5 and/or S1 nerve roots bilaterally" confirmed by both an October 2011 MRI and February 2012 EMG studies. (Tr. 800, citing Tr. 653; *see also* Tr. 624). More recently, a May 2014 MRI study of Plaintiff's cervical spine found additional degenerative changes with involvement of the C6 nerve root. (Tr. 1312). The Commissioner does not dispute that Plaintiff has satisfied the introductory criteria of Listing 1.04 for both her lumbar spine and cervical spine, with "compromise" of the nerve root or spinal cord.

However, the ALJ concluded that Plaintiff's back impairment does not meet or equal Listing 1.04A, which requires Plaintiff to show all of the following additional signs and symptoms:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, subpt. P., Appx. 1, § 1.04. The ALJ acknowledged a history of back pain dating back to 2002, but found that "clinical findings and objective medical evidence …have been variable and contradictory at best." (Tr. 808).

Ultimately, the ALJ found Plaintiff had failed to show definitive nerve root compression. In addition, the ALJ determined that Plaintiff failed to show that she had the requisite limitations of range of motion, motor loss accompanied by sensory or reflex loss, or "consistent" positive straight-leg raising ("SLR") test results in both the sitting and supine positions. Substantial evidence supports the ALJ's findings.

### a. Nerve Root Compression of L5-S1 Versus Nerve Root Irritation

The type of "compromise" of the nerve root or spinal cord required to satisfy the introductory language of Listing 1.04 is satisfied by many disorders, but to satisfy Listing 1.04A,[3] a claimant must prove nerve root compression. Plaintiff asserts nerve root compression at the L5-S1 level. She relies upon the following six records: (1) an April 19, 2010 discogram performed by Dr. Akbik; (2) an October 17, 2011 MRI; (3) a January 2012 neurological consulting opinion by Dr. Cohen; (4) EMG test results; (5) February 2012 examination findings by Dr. Lutz; and (6) a September 2012 opinion by Dr. Saleh.

None of the cited records – with the lone exception of Dr. Saleh's conclusory opinion – expressly state that Plaintiff suffers from nerve root compression. "An implication, based on radiating pain, is not enough to satisfy the Listing." *Miller v. Com'r v. Soc. Sec.*, 848 F. Supp.2d 694, 709 (E.D. Mich. 2011) (affirming ALJ decision that Listing 1.04 was not satisfied where none of records expressly found nerve root compression). While there is some variation in the case law concerning the quantity of proof of actual "compression" that is required to satisfy Listing 1.04A, many courts require fairly explicit evidence. *See, e.g., Adams v. Com'r of Soc. Sec.,* 2014 WL 897381, at *9 n. 5 (E.D. Mich. Mar. 6, 2014) (noting that recent MRI results would not have altered the ALJ's decision on nerve root compression because they "indicate only that a disc protrusion *'abuts* the S1 nerve roots,' not that there is evidence of nerve root *compression*"); *Barnes v. Com'r of Soc. Sec.,* 2013 WL 6328835, at *9 (E.D. Mich. Dec. 5, 2013) ("[Claimant's] x-ray and CT scan show degenerative disc disease and spinal canal stenosis, but there is no mention of nerve root compression in the

_____

[3]Plaintiff does not argue, nor does the record suggest, that she satisfies any other portion of Listing 1.04.

radiologist's reports."); *but see Thomas v. Com'r of Soc. Sec.,* 2014 WL 688197 at *6–8 (E.D. Mich. Feb. 21, 2014)(finding that nerve root impingement was equal to nerve root compression).   In contrast to ALJ Pope, ALJ Motta called two different medical experts to assist her in interpreting the complex medical records and to provide testimony about whether Plaintiff met or equaled Listing 1.04A.   *Compare Moran v. Com'r v. Soc. Sec.,* 40 F. Supp. 3d 896, 926-927 (E.D. Mich. 2014) (remanding where there was some evidence of "potential" nerve root compression, but "not enough for the ALJ to make any findings" without medical expert testimony).

Turning to the six records, I find no error in the ALJ's analysis.   First, the 2010 discogram does not state that Plaintiff had nerve root "compression" as opposed to mere "involvement" or "irritation" or the nerve.   The procedure was performed in order to better diagnose if any particular disc was the source of pain that "sometimes" radiated into her lower extremity.   (Tr. 393-394).   In his report, Dr. Akbik concludes that "the results of her functional discography…[were] <u>not</u> 100% conclusive at the L5-S1 [level] but I <u>suspect</u> L5-S1 is the problem disc."   (Tr. 394, emphasis added).     Thus, the discogram provides no more than inconclusive evidence of possible nerve root involvement at the L5-S1 level.

The October 2011 MRI also fails to indicate nerve root compression at the L5-S1 level.   Instead, the findings include "a tiny disc bulge" at L1-2 and similar "small disc bulge[s]" at L2-3, L3-4 and L4-5.   (Tr. 611).   At L3-4, the report confirms the absence of nerve root involvement.   (*Id.*)   Most importantly, at the L5-S1 level, the MRI reflects "a small disc bulge with associated bilateral facet degenerative change and bilateral uncovertebral joint spurring…[with] moderate right and moderate to severe left neural foraminal narrowing with <u>questionable involvement</u> of the exiting left L5 nerve root," but

9

"no significant central canal stenosis." (Tr. 611, emphasis added). Summarizing this record, ALJ Motta accurately noted that it reflected only "tiny" or "small" disc bulging with no significant central spinal canal stenosis and only "questionable involvement of the left L5 nerve root." (Tr. 800). Thus, the MRI does not indicate nerve root compression.

Third, Dr. Cohen's January 2012 neurosurgical consultation report reflects Plaintiff's reports of radiating leg pain "primarily along the S1 nerve root distribution" with reference to "findings on the MRI which correlate to this," but again contains no statements about nerve root compression. (Tr. 620, 624). The letter indicates that further EMG testing is required, and suggests that a lumbar laminotomy and discectomy at L5-S1 *may* prove beneficial but cautions that surgery is "highly unlikely to help with her long-standing back pain," even though it "may help with the majority of [those] complaints which are localized to the nerve." (*Id.*) A second record dated February 9, 2012, provides further analysis that "advanced degenerative changes" are visible at L5-S1 with only "<u>slight</u> contact and displacement of the left S1 nerve root." (Tr. 624, emphasis added). There was no evidence or even suggestion by Dr. Cohen that the "slight contact" was equivalent to nerve root compression.

The fourth record, EMG testing performed in February 2012, reflects signal findings "consistent with previous/chronic compromise of the L5 and/or S1 nerve roots bilaterally." (Tr. 801, citing Tr. 653). Again, the EMG's reference to the broader medical term of chronic "compromise" (about which there is no dispute) is not equivalent to a more specific finding of "nerve root compression." To the contrary, the EMG confirmed the absence of myopathy or peripheral neuropathy. (Tr. 653).

Plaintiff briefly alludes to a fifth record that includes findings by another pain management specialist, Dr. Lutz. On February 22, 2012, Dr. Lutz stated that the use of opioids "has aided the patient in achieving reduced pain, improved disability [sic], and improved overall function with no side effects." He found "mild spasm" on the left side of Plaintiff's cervical region and bilateral spasm over the low lumbar region, and also recorded Plaintiff's subjective complaints of radiating pain. (Tr. 639). On examination he found normal muscle testing and reflexes,[4] intact sensation, and a negative Spurling's maneuver. (Tr. 639). In one abnormal finding, however, Dr. Lutz found positive SLR "at 70 degrees in both the sitting and supine positions." (*Id.*) However, there is no mention of nerve root compression.

The sixth and final record on which Plaintiff relies is the September 18, 2012 "check-box" single-page questionnaire completed by Dr. Saleh at the request of counsel. Dr. Saleh checked "yes," indicating that Plaintiff met or equaled all elements of Listing 1.04A, including nerve root compression, limitation of motion, motor loss, sensory or reflex loss, plus positive SLR testing in both sitting and supine positions. (Tr. 687). Dr. Saleh was a pain management specialist who saw Plaintiff twice. Suffice it to say that the ALJ did not accept his conclusory opinions, because she found that multiple other medical records showed normal motor examination and normal reflexes, and his opinions were unsupported by "any medical evidence or clinical findings. (Tr. 810-811).

To assist her in interpreting the records relevant to the Listing, ALJ Motta called Dr. Kendrick, a board-certified orthopedic surgeon. Dr. Kendrick testified unequivocally that Plaintiff's condition did not meet or equal Listing 1.04A, in part because the records

---

[4]Dr. Lutz noted that the only decreased reflex was in Plaintiff's right knee, which Dr. Lutz opined was "related to her past knee surgery" as opposed to any back impairment. (Tr. 639). Other physicians found a "normal" patellar reflex upon exam. (*See, e.g.*, Tr. 1257).

showed only the less severe condition of "nerve root irritation" rather than "nerve root compression." (Tr. 837, 848). Based upon the evidence as a whole, the ALJ concluded that Plaintiff had failed to demonstrate nerve root compression, because whether that element existed remained "questionable." (Tr. 810). However, the ALJ stated that "[i]n any case, the medical evidence of record…clearly does not document consistent findings that would substantiate Listing-level severity (as testified to by Dr. Kendrick)," because of the lack of motor loss, muscle weakness, sensory loss or reflex deficits. (Tr. 810). *Accord Colaner v. Colvin*, Civil Action No. 2:12-cv-716, 2013 WL 3811997 at *6 (S.D. Ohio July 19, 2013) (holding that Dr. Kendrick's similar testimony regarding nerve root "irritation" was sufficient to support the ALJ's conclusion that the plaintiff did not satisfy Listing 1.04A), R&R adopted at 2013 WL 5487037 (S.D. Ohio Sept. 30, 2013). When the evidence is equivocal, other courts have given deference to an ALJ's decision to find that the Listing has not been satisfied. *See Miller v. Com'r*, 848 F. Supp.2d at 709 (finding ALJ decision to be supported by substantial evidence where "none of the medical records expressly state[d] that plaintiff suffers from nerve root compression" despite radiating pain and other symptoms).

### b. Range of Motion, Motor Loss, Sensory or Reflex Loss, and Straight-Leg Raising Tests

Regardless of any subtle variations in the case law regarding the amount of evidence required to demonstrate nerve root "compression" as opposed to mere involvement or irritation, it is clear that in general, the requirements of Listing 1.04A are to be interpreted strictly. Here, the ALJ's determination should be upheld based upon substantial evidence that Plaintiff did not consistently demonstrate all of the other components of Listing 1.04A, particularly motor loss with sensory or reflex loss. *See Johnson v. Com'r of Soc. Sec.*, 2015 WL 1912596 at 7 and n.5 (E.D. Mich. April 27,

2015) (affirming ALJ's decision that Listing 1.04A was not met where, despite some evidence, no physician had documented a limited range of motion *and* motor loss *and* positive straight leg raising tests, along with nerve root *compression,* not merely nerve *involvement*).

With that said, the evidence is equivocal concerning the amount of limitation of motion in Plaintiff's spine. Drs. Akbik and Cohen both observed a full range of motion in her cervical spine, but also noted an unspecified degree of "limited" range of motion in Plaintiff's lumbar spine, beginning about a year before Plaintiff's alleged disability onset date. (*See* Tr. 482, 502, 519, 532, 544, 548, 554, 562, 594, 623). An April 2009 exam reported only mild trunk stiffness, but appears to measure some degree of limitation in Plaintiff's lumbar spine. (Tr. 403). However, from December 2013 through August 2014, treating physician Dr. Chaudhry repeatedly found full range of motion with normal muscles and joints. (Tr. 1266, 1274, 1326, 1329). A March 2014 record also noted "[n]o abnormality …on lumbar spine inspection," with no trigger points. (Tr. 1257). On November 12, 2014 and on June 3, 2015, Dr. Usmani similarly found "[n]o abnormality noted on lumbar spine inspection." (Tr. 1335, 1339).

The ALJ's finding that Plaintiff lacked motor loss accompanied by sensory or reflex loss is even more strongly supported. In support of a contrary finding, Plaintiff points chiefly to Dr. Cohen's findings of February 9, 2012, in which he noted "a decreased patellar reflex likely secondary to previous surgery" in the right knee, and normal reflects on the left with "the exception of a decreased Achilles reflex." (Tr. 624). Dr. Cohen also recorded on "light touch" a sensory finding of "decreased somewhat diffusely across the left foot; also decreased in the anterior lateral lower leg just distal to the knee incision." (*Id.*). The same record reflects sensory pain that is "decreased

primarily in the posterior lateral left foot heel and somewhat in the dorsal medial foot; also decreased in the anterior lateral lower leg just distal to the knee incision," with "normal" proprioception. (*Id.*)

Despite the modest evidence of a decrease in Plaintiff's sensory pain and/or left foot reflexes, there is <u>no</u> evidence of any "motor loss," and multiple other records consistently demonstrate full muscle strength and sensation. Courts have noted that the type of "motor loss" required by Listing 1.04A is not the same as mere muscle weakness. *See Miller*, 848 F.Supp.2d at 709 (holding that "muscle weakness" is not equivalent to "motor loss" which is "demonstrated by atrophy associated with muscle weakness," citing *Waits v. Astrue,* 2008 WL 4276547, *10 (S.D. Ohio 2008)). In the same report on which Plaintiff relies, Dr. Cohen noted that Plaintiff had full muscle strength and normal muscle tone throughout her upper and lower extremities. (Tr. 624) On December 23, 2013, Dr. Akbik also found that Plaintiff had full strength in all her extremities and intact neurological functioning, (Tr. 570), and on visits in December 2013, April 2014, and August 2014, Dr. Chaudhry found the same, with intact sensation. (Tr. 1273-74, 1326, 1329). Consistent with full muscle strength, Dr. Chaudhry advised her to exercise. (Tr. 1274, 1327, 1329).

This Court has held that only occasional or intermittent findings of decreased reflexes or changes in sensation of the lower extremities are not sufficient to satisfy Listing 1.04A. *See Irvin v. Com'r of Soc. Sec.*, 2013 WL 3353888, at *10 (S.D. Ohio July 3, 2013) (Black, J., citing *Bailey v. Com'r of Soc. Sec.,* 413 Fed. Appx. 853, at *2 (6th Cir.2011)); *accord Easley v. Com'r of Soc. Sec.*, 2012 WL 3238047 (S.D. Ohio Aug. 7, 2012) (affirming ALJ's conclusion that Plaintiff did not satisfy Listing 1.04, where medical evidence was inconsistent, and several studies suggested nerve root

14

involvement or irritation, not nerve root compression); *Franks v. Com'r of Soc. Sec*, 2008 WL 648719 at*6 (S.D. Ohio March 10, 2008) (affirming ALJ finding that evidence did not show required abnormal sensory, reflex or motor loss, where plaintiff pointed to evidence of each "in certain instances," but evidence failed to show that such findings persisted over time).

Plaintiff also points to Dr. Cohen's findings of a "slightly positive" SLR test on the right, with a "positive" SLR test on the left. (Tr. 624). The record does not indicate whether that test was performed in both the sitting or supine positions. In addition, the ALJ discussed the evidence of other SLR testing that reflected negative results, including an April 2009 report, (Tr. 403), and several records from other medical sources. (Tr. 503, 520, 595). Thus, the ALJ's summation that Plaintiff's records reflected SLR testing that was "positive on at least one occasion but not consistently" in a manner sufficient to satisfy the Listing, accurately reflects the record.

### 2. Weighing the Medical Opinion Evidence and Formulating Plaintiff's RFC

In a closely related second claim, Plaintiff argues that the ALJ improperly weighed the medical opinion evidence. Although remand will be required if the ALJ's analysis is not legally or factually supported, a mere disagreement with how the ALJ decided to weigh differing medical opinions "is clearly not a basis for …setting aside the ALJ's factual findings." *Mullins v. Sec'y of HHS*, 836 F.2d 980, 984 (6th Cir. 1987).

Plaintiff maintains that a "strong argument" can be made that the ALJ should have given the opinions of three treating physicians, Drs. Saleh, Chaudhry, and Usmani, "controlling weight." (Doc. 10 at 28). In the alternative, Plaintiff argues that those three opinions should have received greater weight than that of Dr. Kendrick, at least with respect to Plaintiff's asserted need to lie down and her pain level causing her

to be "off task" to a work-preclusive degree, neither of which limitation was accepted by the ALJ in formulating Plaintiff's RFC. The ALJ acknowledged that the opinions included work-preclusive postural and concentration limitations, but found "no medically determinable basis for any such restrictions." (Tr. 814). The ALJ reasoned:

> The extent of impairment described by the above-referenced physicians could only be based on uncritical acceptance of the claimant's subjective complaints. Treatment records do not document physical abnormality of a severity that would be expected to result in such a substantial degree of limitation. Consequently, the rather serious degree of limitation describe by Dr. Saleh, Dr. Chaudhry and Dr. Usmani (particularly with respect to the need to lie down periodically and the likelihood of being "off task" repeatedly during any given day) is found to be unsupported by the evidence and given little-to-no weight (and no controlling or deferential weight).

(Tr. 814). In assessing Plaintiff's RFC, the ALJ gave the greatest weight to the opinion of medical consultant, Dr. Kendrick, though she also gave some weight to the opinions of two state agency consultants who reviewed Plaintiff's file in December 2011 and in April 2012, despite the latter two physicians' characterization of Plaintiff's RFC as inclusive of some "light" work. (Tr. 815).[5]

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p. The Commissioner is required to provide "good reasons" if the Commissioner does not give controlling weight to the opinion of a treating physician. *Id.*

---

[5]Contrary to Plaintiff's argument, the ALJ's opinion does not reflect that she gave the "most" weight to those two opinions. (*Compare* Tr. 144-146; 172-174, with Tr. 811).

The treating physician rule generally requires the ALJ to give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley*, 581 F.3d at 406. However, in *Blakley* the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances," the opinions of non-examining consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Id.*, 581 F.3d at 409 (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). While an ALJ may not reject a treating physician opinion solely based on the conflicting opinions of non-examining consultants, *see Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013), no reversible error occurs when an ALJ determines that a treating physician opinion is not entitled to controlling weight because it is not well-supported, is internally inconsistent, and/or is inconsistent with the record as a whole. The undersigned finds no error in the ALJ's decision not to give any of the three physician opinions "controlling weight," because the ALJ explained her basis for finding the opinions not well-supported (all three physicians), internally inconsistent (as to Dr. Chaudry and Usmani), and inconsistent with the record as a whole (all three).

First, it must be noted that while technically he is a "treating" physician, Dr. Saleh appears to have examined Plaintiff only twice in 2012. He documented some tenderness to palpation, reduced range of motion, and positive SLR, but normal gait. (Tr. 691, 695). As discussed, multiple other examination findings by other treating physicians disagreed with Dr. Saleh's findings and lend strong support to the ALJ's rejection of his conclusory and largely unsupported opinion that Plaintiff met or equaled all criteria of Listing 1.04A, including motor loss. (*See* Tr. 687). As the ALJ put it:

> [S]imply stating that these circumstances [all the elements of Listing 1.04] exist is not sufficient to make it so. This is quite evident in the medical records exemplified by Exhibit 21F at 2. Dr. Usmani (another treating pain management physician) reported "no abnormality noted on lumbar spine

17

inspection." Motor examination revealed no abnormalities. Reflexes were normal.

....

[D]espite his assertion that the claimant has such [Listing level] impairment, Dr. Saleh did not provide any objective medical evidence or clinical findings to substantiate that conclusion.

(Tr. 811, citing Tr. 1257, examination findings of 3/18/14).

Aside from her arguments concerning Dr. Saleh's Listing opinion, Plaintiff challenges the rejection of the opinion endorsed by Drs. Saleh, Usmani, and Chaudry, that Plaintiff would need to lie down at least one hour during the work day. The ALJ also rejected the opinion of Drs. Usmani and Chaudry that she would be "off-task" a substantial amount of the work day.

In September 2012, at the same time that he completed the one-page "Listing" opinion/questionnaire, Dr. Saleh completed a one-page functional ability questionnaire in which he checked "yes" to a question concerning whether Plaintiff would need to lie down "several times a day," and opined that she could sit up to 4 hours, and stand/walk only up to 3 hours. The form indicated that if postural limitations totaled less than 8 hours, that meant that the patient would be required to lie down or recline for the remainder of an 8-hour day. (Tr. 689). Dr. Saleh further found Plaintiff could only "occasionally" lift or carry up to 20 pounds. Contrary to Plaintiff's argument that she had work-preclusive focusing limitations, however, Dr. Saleh, responded "No" to the query: "[I]s it reasonable to believe that [Plaintiff] would have impaired abilities in terms of concentration and attention to detail given her chronic pain?" (Tr. 689).

Dr. Usmani treated Plaintiff for pain management from March 19, 2014 through December 30, 2014. On January 2, 2015, he opined on a similar questionnaire that it was more likely than not that Plaintiff would need to lie down several times a day, and that she would likely suffer from "significantly impaired concentration and focus because

18

of her pain" and be "off task" for 20% or more of a typical day. (Tr. 1330). Like Dr. Saleh, Dr. Usman believed Plaintiff was able to sit for 4 hours, stand/walk for 3 hours, and would need to lie down or recline for the remainder of an eight-hour day. He indicated that she could only occasionally lift or carry up to 10 pounds and "never" lift more than 10 pounds. (Tr. 1331). Five months later on June 7, 2015, Dr. Chaudhry (who treated Plaintiff from December 23, 2013 through May 4, 2015) completed a third questionnaire that referred almost entirely to Dr. Usmani's responses. The questionnaire asks "would you agree with" the limitations Dr. Usmani suggested, to which Dr. Chaudhry has checked "yes." (Tr. 1362).

The ALJ accepted and incorporated into Plaintiff's RFC the opinions that Plaintiff could not lift more than 10 pounds or stand/walk more than 2 hours per workday, but otherwise did not adopt the more extreme postural restriction that Plaintiff would need to lie down or recline for at least one hour during the work day. Instead, the ALJ determined that Plaintiff was capable of sitting up to 6 hours, and standing/walking up to 2 hours. In other words, the ALJ's RFC determination was consistent with the treating physicians' lifting restrictions and with their opinions of Plaintiff's ability to stand/walk 3 hours (which the ALJ further reduced to two hours), but allowed for a greater amount of sitting (6 hours versus 4 hours endorsed by the treating physicians), with a sit/stand option.

In support of the longer ability to sit, the ALJ cited Dr. Kendrick's hearing testimony as a medical expert who had reviewed the entirety of the record, and the opinions of the two non-examining agency consultants. (Tr. 815). Although the ALJ only partially credited the opinions of the latter agency consultants, their opinions concerning Plaintiff's postural limitations were consistent with the ALJ's determination.

The ALJ was permitted to consider the medical evidence and record as a whole, including records and treatment notes that showed that Plaintiff had much less disabling symptoms with full range of motion and normal muscle strength and tone and normal neurological functioning, with intact sensation, normal gait, and inconsistent positive and negative SLR tests. Keeping in mind that this Court must affirm so long as an adequate amount of relevant evidence supports the ALJ's analysis, even if the evidence could support an alternate decision, I find substantial evidence to support the ALJ's reasons for finding "no medically determinable basis" for the limitation to just 4 hours of sitting, with a mandate that Plaintiff lie down at least one hour per 8 hour period and be "off task" to a degree that would be work-preclusive. (Tr. 814).

Only "well-supported" treating physician opinions are entitled to controlling weight. Here, none of the physicians' treatment notes mention Plaintiff needing to lie down during the day or being "off task." Their opinions were not well-supported, were inconsistent with their own findings, and contradicted by other record evidence. In addition to the referenced imaging and nerve studies, and multiple clinical records that reflect a less severe condition, in March 2014, Dr. Usmani himself found no abnormality of the lumbar spine. (Tr. 814, citing Tr. 1257). On June 3, 2015, Dr. Usmani expressly noted that Plaintiff denied any radicular symptoms and that Plaintiff "continues participating in daily activities such as [p]erforming household chores." (Tr. 1339). Dr. Chaudry found full muscle strength and intact sensation on visits in December 2013 and in April 2014 and August 2014, and recommended that Plaintiff engage in an exercise course, which appears inconsistent with the severe restrictions he endorsed. (*See* Tr. 809, citing Tr. 1326, 1329; *see also* Tr. 1273-74).

20

Plaintiff claims that the treating physicians' opinions were not entirely inconsistent with other record evidence, relying on the same evidence previously discussed. She further contends that the testimony of the medical expert at the first hearing, Dr. Brahms, supports her claim. Plaintiff accuses the ALJ of an outcome-determinative analysis, suggesting that ALJ Motta only discounted Dr. Brahms' testimony and "decided to hold a second hearing" because she "was not satisfied with [his] testimony." (*See* Doc. 12 at 12).

I find that the ALJ properly discounted Dr. Brahms' testimony, in part because it was based upon an irrefutable misinterpretation of Listing 1.04A.[6] (Tr. 796). Even if considered, however, Dr. Brahms' testimony does not support Plaintiff's claim and arguably refutes her theory that the ALJ's decision to call a second medical expert was based upon an illicit motive to rule against the Plaintiff. It is true that Dr. Brahms generally agreed that Plaintiff's complaints were consistent with her 2011 MRI, and displacement of the left S1 nerve root. However, he never agreed that Plaintiff met or equaled Listing 1.04A, not only because of her ability to ambulate, but also because of her inability to meet other elements of the Listing, including "inconsistent SLR test results." (Tr. 888-890). And he testified that he "**would**…take issue with" an indication by Plaintiff's treating physicians that Plaintiff "would have to lie down off and on because of her pain," testifying that simply was not "plausible." (Tr. 896, emphasis added). Although he eventually agreed that she may need to lie down for a period not to exceed "an hour or two" per day, (Tr. 896), in context and on the whole his testimony implied that any such need could be satisfied outside of the 8-hour workday. Ultimately, Dr.

---

[6]A portion of Dr. Brahms's opinion that Plaintiff did not satisfy Listing 1.04A was based upon a mistaken assumption that the Listing criteria require an inability to ambulate effectively. Although other subsections of Listing 1.04 require that element, Listing 1.04A does not.

Brahms opined that Plaintiff remained capable of the postural restrictions of light work. A limitation to "light" work is even less restrictive than the sedentary RFC found by the ALJ. (Tr. 887-888; *compare* Tr. 811).

The two discounted RFC limitations are both based upon Plaintiff's subjective reports of pain. Cases that rest on subjective complaints of pain are inherently challenging, as many people who endure chronic pain remain capable of work.

> The Sixth Circuit has accepted that pain, on its own, may be enough to satisfy statutory disability standards, but only where complaints of pain are supported by medical evidence. *Kirk v. Sec. of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir.1981). As stated above, where treating physicians make "broad conclusory formulations" regarding the presence of a disability, these statements "are not determinative of the question of whether or not an individual is under a disability. This is particularly true where pain is the disabling illness." *Id.* (internal citations omitted). "Tolerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant." *Villarreal v. Sec. of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987) (quoting *Houston v. Sec. of Health & Human Servs.,* 736 F.2d 365, 367 (6th Cir.1984)). Accordingly, the conclusions of an ALJ with the "opportunity to observe the claimant ... should not be lightly discarded."

*Kaylor v. Commissioner of Social Sec.*, 2015 WL 350626, at *11 (S.D.Ohio,2015).

Here, Plaintiff does not challenge the ALJ's adverse credibility finding. (*See* Tr. 809, finding Plaintiff's pain complaints "somewhat suspect," and her credibility "questionable" given lack of consistent corroborating clinical findings, coupled with the remoteness of the 2002 accident that allegedly caused her symptoms, and history of drug abuse). *Accord Gayheart*, 710 F.3d at 378 (noting that ALJ had sufficient support for discounting opinion based on "subjective claims" rather than detailed clinical data).

In evaluating Plaintiff's complaints about the intensity of her pain, the ALJ found her testimony to be

> largely unsubstantiated by convincing objective medical evidence or clinical findings. The claimant's allegations appear quite excessive when

viewed within the context of the medical record. The claimant attributes her continuing pain to injuries sustained in 2002 yet she does not allege disability until 2008. Treatment records from 2007 indicate improvement in the claimant's condition with treatment and significant alleviation of her pain symptoms. However, inexplicably, in 2008, the claimant allegedly began experiencing debilitating pain and the need to use an ambulatory aid. Nevertheless, the claimant is able to live alone and to maintain her own residence. The claimant made conflicting statements in the past concerning her use of drugs. There are indications in medical records of drug-seeking behavior… She was incarcerated for six months in 2013 for drug trafficking. (23E). On one occasion, the claimant indicated that she was "pain free" and that she needed no medication. She reported doing well and having increased her activity level… In May 2015, the claimant reported during a physical examination that she was able to function well while using pain medication. She denied experiencing any adverse side effects….

Drug screen testing in 2012 was positive for opiates and benzodiazepines… The claimant was incarcerated …from April 19, 2013, to October 1, 2013, for drug trafficking. The references to drug-seeking behavior and misuse of prescribed narcotic pain medication in the record seem to provide a possible basis for the claimant's on-going pain complaints and (apparent excessive) allegations of disabling symptoms. Another period of incarceration occurred because of probation violation. The claimant testified that her treatment with one physician (Dr. Lutz) was terminated because she tested positive for cocaine. The claimant testified that she last used cocaine in 2010 but the evidence shows there was a positive test for cocaine in 2012 (9F at 7). As to credibility, an examining psychologist for the workers' compensation claim stated that her MMPI testing may be invalid and her profile indicated possible over-reporting of psychological symptoms….There is no significant mental health treatment in this record. There is also a gap in the record from late December 2012 to December 2013. Although the claimant was incarcerated for approximately 6 months during that timeframe, no treatment appears to be documented for an entire year….

(Tr. 817-818). The ALJ also noted she had (falsely) denied current or past drug use. (Tr. 818).

In support of her asserted need to lie down and work-preclusive "off task" time due to pain, Plaintiff points out that even Dr. Kendrick agreed that people with "some indication of nerve irritation and radiculopathy…often indicate that lying down is more comfortable…than either prolonged sitting or standing." (Tr. 855). In addition, he stated

that he "would not disagree" if Plaintiff's physicians indicated that "it's reasonable to believe that she would have had to lie down at times off and on throughout the course of a typical day," (*id.*).   However, Dr. Kendrick's testimony on the whole strongly supports the ALJ's non-disability determination.   Dr. Kendrick explained that Plaintiff's "primary issue is one of pain that's not reasonably well controlled," but also testified unequivocally that her pain level should not and would not preclude her from full-time sedentary work – testimony that is inconsistent with a requirement that Plaintiff lie down at least one hour per work day.   (*See* Tr. 838).   As to Plaintiff's ability to focus versus being "off task," although Dr. Kendrick testified it was "possible" that an individual "with persistent low back and radiating leg pain or…cervical pain on top of that would likely be distracted by pain," (Tr. 853-854), he did not believe that whatever "possible" amount of distraction Plaintiff would experience was work-preclusive.

The ALJ found that Plaintiff was limited to "only simple repetitive tasks of a low stress nature (i.e., no production quotas or fast-pace and only routine work with few changes in the work setting)." (Tr. 811).   The ALJ pointed out numerous clinical records that either did not substantiate the level of pain alleged by Plaintiff, or undermined it.   The ALJ pointed out that Plaintiff's reported pain level to her physicians was not consistent, with many records reflecting improvement.   (Tr. 809; *see also* Tr. 1316, chiropractic records from November 2014).   A 2014 nerve condition study was negative for radiculopathy in Plaintiff's upper extremities.   (Tr. 1306-1307).   Besides limiting Plaintiff to simple repetitive tasks, the ALJ restricted her contact with the public and with co-workers and supervisors, stating that such restrictions would sufficiently "account" for

Plaintiff's "documented mental impairment and/or pain or possible adverse side effects[7] from treatment or narcotic pain medication." (Tr. 816). Substantial evidence supports the ALJ's determination that Plaintiff's pain level did not preclude her from sitting up to 6 hours, or require additional work-preclusive "off-task" limitations.

### III. Conclusion and Recommendation

Plaintiff's back condition is degenerative, and the evidence (including the addition of a cervical impairment in 2014) suggests that it may be worsening over time. To the extent that her condition continues to progress, she may reapply for SSI benefits despite the expiration of her insured status for DIB benefits. However, substantial evidence exists to support the non-disability determination made through the date of ALJ Motta's decision. Accordingly, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED a**nd that this case be **CLOSED.**

*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

---

[7]In numerous records, Plaintiff denied any side effects from her pain medications. (Tr. 1339).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LISA BRAUNINGER,                                    Case No. 1:16-cv-926

        Plaintiff,                                Black, J.
                                                     Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).